Citizens for Better Forestry v. USDA And a lot of people associate it with the pig maillot I guess. More people associate it with the pig itself. That's right, yeah. Good morning, Your Honor. I'm Michael Axelon, appearing on behalf of Plaintiff Appellant's Citizens for Better Forestry. It's our position today that the District Court erred in three ways, in its opinion below. First, it erred in finding no reasonable probability that defendant's regulations will adversely affect the plaintiff's interest in specific areas of the national forest system. Second, it erred in finding that plaintiff's challenges under NEPA and the Endangered Species Act to the defendant's regulations were not ripe for judicial review. And third, it erred in sua sponte striking two exhibits to plaintiff's motion for summary judgment. I'd like to address those issues in order. The first issue has to do with standing. And before I address the specific test that's been adopted for establishing standing, I'd like to address the overall purpose of the standing requirement, because I believe it's important to keep that purpose in mind as we evaluate the test. The purpose of the standing requirement is to ensure that the parties who bring a dispute before the court have a sufficient stake in the outcome of the case to present the court with a factually concrete context and to allow the court to have an appreciation of the consequences of its judicial ruling. We believe that that purpose is satisfied by the plaintiffs in this case, all of whom have been extensively involved in commenting on and overseeing national forest management for some time. The first part of the official test for standing asks the court to look at injury in fact and to determine whether or not the plaintiffs have suffered a concrete and particularized injury as a result of the challenged conduct. We submit that that part of the test is satisfied in this case by the declarations that the plaintiffs submitted in response to the government's motion. Those declarations, I think, are particularly instructive if you compare them to the declarations that were submitted in the Salmon River Concerned Citizens case. The two declarations submitted in the Salmon River Concerned Citizens case by Larry Glass and Mr. David Webb described their uses of two national forests and argued that their ability to use and enjoy the areas of those forests that they did attend would be adversely affected by a regional directive allowing additional uses of pesticides. The declarations submitted by the plaintiffs in this case, Your Honor, are even more specific with respect to the particular areas of specific national forests that the plaintiffs use and enjoy and that will be affected by the adopted regulation. The second part of the injury test asks the court to examine whether or not the alleged injury is sufficiently imminent to warrant judicial attention. For this part of the test, the imminence is tempered somewhat by the nature of the claim that the plaintiffs have brought, which is a procedural challenge to the adoption of the regulation. This Court and the Supreme Court have both recognized that when a procedural injury is presented and it is coupled with a concrete injury to a specific area of use, the imminence requirement is relaxed. And as the Supreme Court said in Defenders of Wildlife, even if the ultimate on-the-ground injury is many years away, so long as the procedural flaw has already occurred, the imminence test is satisfied. Was there an obligation in this case to prepare an EA or an EIS at all? Yes, Your Honor. That's the substance of our NEPA claim. I know that's the substance of your claim, but why do you believe that for this programmatic plan the requirements of NEPA needed to be complied with as opposed to the legions of cases where there's some site-specific plan and NEPA is obviously required? Well, there's a practical reason and a legal reason, Your Honor. The practical reason is that the regulation, because it applies nationwide, has more impact than any site-specific decision can. And therefore, Congress in NEPA would have wanted the agency even more intensely to consider the environmental consequences of its action. There's no question here, but the adoption of the regulation was a final action. The legal answer, Your Honor, is that this Court and others have repeatedly recognized in the past that when an agency adopts regulations, whether they're nationwide or not, those regulations are subject to the National Environmental Policy Act. But what is the imminent harm to concrete interests that your clients claim from this national policy where no steps have been taken to implement it in a way that threatens any harm? Well, it's the type of harm that this Court recognized in Salmon River Concerned Citizens and in MUMA, where the agency action has resulted in an increased risk or decreased protection. Both of those phrases have been used for areas that are used by the plaintiffs. And here, the new regulation has increased the risk of species elimination by removing the viability requirement that existed in the old regulation. And that viability requirement has been recognized by this Court in the Inland Empire case as being a critical component of the National Forest Management Act implementation scheme. So the type of harm that is alleged is precisely that, the increased risk to the areas used and enjoyed by the plaintiffs. Mr. Eichlein, with respect to your substantive challenge, right, what is the status of that now in the district court? Did it just stay? Well, it was never addressed because the summary judgment motion dismissed the case before that was included. But didn't you just stay the – didn't the district court stay the – you know, your substantive challenges? The substantive challenge to the NIFMA regulation was stayed. That's correct. So that's still pending in the district court? Yes, it is. And has anything happened on that? No, Your Honor. Nothing's happened on that. All right. Is the district court waiting for the outcome of this appeal? Do you know? I believe so, Your Honor. All right. Well, would you comment on the – the government says some of those regulations about involving the public are auditory. Now, shouldn't we defer to the agency's view of its regulations? Not when they're inconsistent with this Court's prior opinions, Your Honor. That issue, that's – I have to say that was a little odd in the district court's opinion, I think. This Court in MUMA, in Idaho Conservation League, and Salmon River Concerned Citizens has used the language of the plaintiff's right to comment and participate in the NIFA process. So the government, of course, has picked up on that language in the district court's opinion, but that appears to me to be contrary to the descriptions of that participation as a right in this Court's prior opinions. It seems odd that the Forestry Service felt an obligation to – or had – believed it had an obligation to prepare the EA and the EIS, but that they did it in secret. When did you find out that this had even been done? No disagreement that that seemed odd, Your Honor. We found out when it was posted unexpectedly on the Forest Service's website after the close of comment period on the regulations itself. And perhaps that question could be addressed to the Justice Department. I will, but it's my understanding that they're arguing that they weren't even required to prepare one. They just went ahead and prepared one anyway. I think that is their argument, Your Honor. Your Honor, and obviously we think that is wrong, and we'd like to present the merits of our claim on that to the district court if we can get past the standing and rightness issues. Now, the district court, in the order for clarification, said yes, denying your motion for injunctive relief, right? That's correct, Your Honor. But did it give an indication of the – of, you know, any reason other than just because you lack standing, right? Is that the reason they denied the – I think that's correct, that he felt he didn't have jurisdiction, I guess, because of his standing ruling. All right. So he denied the request for injunctive relief. But the district court made no additional indication as to any reason for denying relief other than when that already happened before. That's correct. There was no balancing of the equities or factual determination on that score. If I can make one final point before I move on to rightness, Your Honors, and that is that – and this does go to Judge Wardlaw's question about the national nature of these regulations. That is that if the district court's opinion is allowed to stand, then the most impactful and important decisions, decisions that are admittedly subject to judicial review under the APA, assuming standing and rightness, are going to forever escape judicial review, as the dissent said in the Florida Audubon Society case. What will happen will be that as the rules get implemented by the regional and local forest managers, that then there will be challenges to each of those individual rules or plans as they go forward? Yes. But there won't be challenges to the procedures that we're saying were not followed in this case, Your Honor. If you can imagine a couple of years from now, let's say, in 2005, when a site-specific decision is made and refers back to this, the adoption of this regulation, to require plaintiffs to wait that long or for the court to wait that long. Probably would not have – there would be probably latches or something, right? Yeah, or even statutes of limitations. But more than that, as a practical matter, it just doesn't make any sense. And as the Supreme Court has said in Defenders of Wildlife that, you know, the time that you should be allowed to challenge a NEPA violation is when it occurred. And that relates also to the hardship component of the rightness test, Your Honors, because the hardship – well, one aspect of the hardship that results from the government not following proper procedures is that as that decision is carried out over time, it becomes more and more difficult to go back and correct, so that even if, for some reason, comments were taken in 2005 on the regulation adopted in 2000, the likelihood of that procedure having the effect that Congress desired is greatly diminished. And quickly, with respect to redressability, the showing of redressability is a relatively easy burden. All the plaintiffs need show is that a decision could be influenced by redoing the decision and using the proper procedures. And I think there is a presumption that that's the case, because that's what Congress thought when it adopted NEPA, is that better procedures would lead to better decisions. With respect to rightness, the district court's opinion, I think, did two things. It misunderstood the relationship between standing and rightness, and it misapplied the Ohio Forestry's conclusion with respect to rightness. The court found that because standing is a predicate to rightness and plaintiffs didn't have standing, therefore there was no need to address the rightness issue. And I think that since it was wrong on the standing issue, it was wrong on that holding with respect to rightness. But second, the court held that despite the plain language in the Supreme Court's Ohio Forestry opinion that NEPA cases are right at the time of decision, the court must not have meant what it said because it remanded the whole case for dismissal. Well, the district court's opinion had addressed the merits of the NEPA case and ruled against the plaintiffs on the merits. So the reason that the Supreme Court's opinion or the Supreme Court's act at the end of the case didn't contradict its statement that rightness was present with respect to NEPA is that the rightness issue with respect to NEPA wasn't before the court. So that language is admittedly dicta, but we think it's relevant dicta. One other question. Given the enactment of these interim rules, do we really have a final agency action? We do have a final agency action, Your Honor, and thank you for mentioning that. As the Court is aware, the Supreme Court in the Laidlaw opinion addressed the dividing line between the issues of standing and rightness and mootness and determined that standing and rightness are determined as of the time that the complaint is filed. If the government wishes to suggest that the case has become moot post-complaint, it should submit a brief on that issue, I think. But you consider it in the mootness context, and the reason that makes a difference is that the burden shifts to the government to establish that the case is moot and different tests apply. And I'll reserve the rest of my time for rebuttal. That's fine. Thank you. Good morning. May it please the Court. I'm Sylvia Cross for the Forest Service and the Department of Agriculture. I'd like to go right to the issue of threat or injury to the appellants here because that's obviously the key to both standing and rightness. Citizens for a Better Forestry is basically resting its case on procedural injuries, and it's very clear from both the Defenders of Wildlife case in the Supreme Court and the Cantrell case that procedural injury alone is not enough. There has to be some sort of concrete injury, some sort of concrete threat to a particularized interest of the plaintiffs. Well, what do we have here? They're relying entirely on a geographical nexus. They say they visit the forests. But what's the threat to that interest? What we're saying is that that hasn't been explained. What is the concrete threat? What's the particularized threat here? Is there doubt that the 2000 rule relaxes the national forest standards? Absolutely. There is doubt. That's exactly what we're saying. The evidence isn't there, first of all. The things that they cite, too, were things that the district court specifically said were not things that could be introduced here. What about the viability question? On the viability question, one of the key things that's being discussed in the 2000 rule is the importance of preserving species and protecting sustainability of species. What we're saying is we Doesn't the rule itself or the plan itself allow for relaxation of the standards? I think what we're saying is that we differ with that position. We're saying that the rule here, you can't look at the rule in terms of what isn't in this rule that was in the rule before it. The Forest Service has to apply the rule as a whole, and the rule is very concerned with protecting species and sustainability of ecosystems in general. So in that sense, there isn't a relaxation here. So you're saying you did have a stricter rule before, and this new rule is not as strict, but we shouldn't be looking at what you had before to analyze whether or not this new rule relaxes the standards. We should just look at this rule itself and look at all the discretionary factors within that rule. No, I disagree with you on saying that this rule is less strict than the other rule. This is a different rule, no doubt about that, no question there. But we're saying that when this rule is applied as a whole, rather than looking at things that aren't there, that we think there would be at least as much protection here. That was one of the important goals of this rule. That were there in the prior rule? You just said things that aren't there. That were there in the prior rule, is that what you're referencing? Right. Just because there aren't certain standards in a certain language that was in the prior rule doesn't mean necessarily that this rule is less strict. Just because things are different doesn't mean less strict. We're saying here that this rule is as protective as the old rule. It uses different language, it gives more discretion, that's certainly true, but that doesn't mean it's less protective. Well, is it your position that NEPA did not require you to prepare an EA or an EIS at all? That is our position, because this rule has no effects on the ground here. There is no effect to the fiscal environment. There's a couple more stages that you have to go through. And when did you develop that position? Was that after you prepared an EA and an EIS? I think that was the position all along. I mean, as a matter of fact. There was no need that you were going to do it anyway? As a matter of fact, we could have used – there are cases before this. Let me go right to what I think you're getting at, which is why do an EA if you don't think you need to do one? There are other cases that this court has looked at. I'm thinking specifically of the Burbank anti-noise case, where this court has said, sometimes the agencies will go forward, they'll go through this process and make these considerations, but they don't have to. If they want to do that, that's great. It seems to me you shouldn't discourage people from using that process, thinking about environmental considerations, unless they're absolutely sure that they have to do it here. That's a good point. But if you're going to go through it and do the EA and the EIS, why cut out the public comment? There was a lot of public comment on this rule, lots of public comment. We described that in the statement of facts here in terms of what the environmental implications were going to be, what the implications were going to be more generally. The public was not cut out of this. And we specifically said that we were going to be going through some sort of environmental review process, and that's described in our brief. It's true that there wasn't a specific whole other separate public comment process for the EA process, but as we noted, we had many, many public meetings, thousands of pages of comments from the public on this. Right, but the EA, as I understand it, and correct me if I'm wrong, the EA and FONSI was prepared but not published until after the public comment period expired. That's right, the public comment period on the rule. That was prepared. Which was not a comment on the EA, EIS. There isn't any obligation in NEPA to have a public comment period on the EA. That's what I'm getting to. Right. That's what I'm getting to. I mean, yeah, and you responded by saying, well, we had public comment. Well, you had public comment on the rule, and then you went ahead and did an EA and EIS, but you didn't take public comment on that, and I'm just wondering. There's no case law on this, and perhaps it's because if an agency does go forward with the EA, EIS, that it goes all the way and allows public comment. Something that we should get clear about is the difference between an environmental assessment in EA and an environmental impact statement. I understand what those are. Right. We don't have to get those clear. Okay. Why did you cut out the public comment on the EA? We weren't required to have a whole other separate public comment process on the environmental assessment. That's not required by any of the rules pertaining to this. You definitely have to have public comment on an environmental impact statement. There's no question about that. But you can't import that whole set of rules for that much more complicated involved process to the environmental assessment process. There wasn't a requirement there. We already did have a lot of public comment and got a lot of public comment on environmental consequences of the rule. It would have been redundant to have yet a whole other process on the separate EA here is what we're saying. Is it your position that you made a comment something like this a while ago? I want to be sure I understand you. Is it your position that an EIS is never required for a programmatic rule? I would say I don't want to – I wouldn't necessarily take that position for a programmatic rule. It's going to depend on the kind of rule that you have. We're just saying that in this context, for this type of rule, where you're really talking about a rule that sets up procedures for doing a forest plan, which sets up how you go about making site-specific decisions, that you're so far removed from any actual impacts on the environment that you don't need to go through NEPA here. And, in fact, the Forest Service could avail itself of a categorical exclusion from NEPA and is planning to do so in the proposed rule that it's working on right now, and that's in the middle of public comment. That's right in the Forest Service regulations. It chose to go forward with an environmental assessment to be doubly sure to go through and make sure it got the environmental analysis correct, but it didn't have to do that. It could have relied on the categorical exclusion that it had. Are you standing by your position in the brief that the regulations requiring public involvement are merely auditory? With regard to environmental assessments, that's correct. This isn't what we said in the Anderson case. We said draft EAs as well as EISs must have an opportunity to comment. That's going against Ninth Circuit law. I don't think that we're going against Ninth Circuit law. Sorry. I didn't think that we were going against Ninth Circuit law. We try to avoid doing that. That's the words of this Court. I think our position remains that that's not something that's required by the regulations here. Oh, I understand. Right. But with those going beyond the regulations. Right. I understand that. I think that we don't agree with that in terms of ñ right. I'm sorry. Which was the ñ what's the name of the case again, Your Honor? Anderson v. Everton, 314, F-3rd, quote from page 101, page 101. I don't see that addressed in the briefs, or maybe I missed that, Your Honor. If I could, I'd like to have an opportunity to respond to your point, if that be possible. Sure. I'd be happy to do that. You want to just submit a brief? Just a short letter brief. Just a short letter brief on this particular case? Right, because I wasn't quite sure when you were mentioning it. I'm not familiar with that. We'll give you that opportunity. We'll give it to Mr. Axellein, too, all right? Within a week? Yes, please. Of today. Thank you. I'd like to talk for a moment about the Ohio Forestry case in rightness. In fact, NEPA was at issue in that case, as we identified in our 20HA letter to the court that was raised by the respondents in that case, and it was addressed also by the petitioners in that case. The respondents also mentioned an oral argument that they had discussed NEPA below. I think what Ohio Forestry teaches us is that there is no absolute rule that all NEPA claims are immediately right, but that you have to look to injury here. Is there some sort of injury or immediate threat to the plaintiffs? And, again, what we're saying here is that that has not been shown here. We have on the one hand them saying that they have the geographical nexus of visiting the forest, on the other hand making allegations about substantive weakening of the rule. We obviously don't agree with the substantive weakening. We also would point out that they didn't do what they needed to do to show that there was substantive weakening to the district court below, that the evidence that they submitted was not admissible. And plaintiffs didn't challenge that. They did file a motion for reconsideration, but they didn't suggest in any way that there was anything wrong with that ruling. And, in fact, they haven't shown that that evidence is admissible at this level either. There's a number of problems with that that we identified in our letter brief, and I won't go through those here unless the court has any questions. The plaintiffs are not foreclosed from challenging this rule at a subsequent date if they can show that there's been some sort of site-specific action that has actually caused them some harm or threatens them with some particularized harm. That opportunity is there, so I wanted to correct that misimpression that may have been left. Also, this is not the last word on NEPA. The rule itself requires that more NEPA has to be done for forest plans, that NEPA compliance has to be done for site-specific plans as well. So there's going to be much more discussion of these things. At bottom, what's happening here is we're getting entangled, the colloquy that Judge Wardlaw and I were a good example of that, in an abstract debate over whether this rule causes substantive weakening to environmental protections or not. And the place to decide that is when some more site-specific action has happened, not here rather than trying to figure out what's really going to happen. It's a standing question, and if the allegation is made that it will, that's what they have to allege, and they've said that, and they've supported that. I would respectfully disagree with you. They haven't supported that at this level, that there's been a substantial weakening. The documents that they rely on were inadmissible, and they haven't cited to anything else. But I would also ask, they say that there's some sort of substantive weakening, but how is it that that's going to affect their visits to the National Forest? That connection hasn't been made either here. With regard to, lastly, with regard to the relief, request for injunctive relief at the end of the reply brief, no case has been made for that happening here, and we believe we've shown a serious question about whether they would prevail on the merits. There was certainly no discussion of this in the district court. The merits weren't addressed at all in the district court, is that correct? No, this was not addressed at all in the district court, so there's really no basis for this Court awarding injunctive relief at this point. I was just a little confused by your discussion of Ohio Forestry. My understanding of the holding was that the court distinguished NEPA cases from National Forestry Management cases on the grounds that it's a procedural violation, so the injury occurs at the time, and that's why it's ripe. That's why NEPA would be ripe. There is language at the end of the opinion talking about if a plaintiff has standing because it has injury, then the claim is ripe, but I think that's an important proviso. I think it's because it's saying not all NEPA claims are automatically ripe. That constitutional requirement has not been abrogated by this case, so we need to be focusing on the injury and whether there's been actual injury being shown here to determine whether there's ripeness. And injury to a concrete interest. Right. Fair enough. Or threat and injury, but we're saying that that hasn't even been established here. If there are no further questions. No. All right. Thank you. Thank you, Ms. Kwasi. Let me start with an apology. I had intended to notify the Court of Additional Authorities, and we've submitted the Additional Authorities today. And since I didn't mention this, I'm not going to argue them or anything, but I'd like to give Ms. Kwasi an opportunity to object to the submission. If I could include that as part of my letter of response. That's fine. Thank you. Thank you, Your Honor. I'd briefly touch on the suggestions made by the government. First, that procedural injury alone is not enough. We're not arguing in this case that procedural injury alone is enough. We're arguing that there was procedural injury, and we have tied it closely to geographic areas that the plaintiffs use and enjoy. And I'd also like to address your comment, Judge Wardlaw, that the viability standard, with respect to the viability standard, we do obviously believe that the viability standard has been relaxed. And I think it's plain from setting the two regulations down next to each other. But I also think that it's important not to mix the merits with the standing issue, as the Court said in Laidlaw. And this is particularly easy to do in a procedural case. So the way I view this case is that we are challenging a change to an agency's standard. And the merits of the case have to do with whether that new standard is within the permissible range of the underlying statute. But it is kind of mixed up in the fact that you need to show some threatened injury to concrete interest, and there isn't threatened injury to concrete interest unless somehow the rule has relaxed some of the standards or contains within it some elements that would threaten those interests. So it is kind of bound up in that question. No question about that, Your Honor. It's bound up. But the level of proof that's required to address it is, I think, different when you're addressing standing. And another aspect of Laidlaw is, I think, relevant to that standard of proof, and that is that Laidlaw, because of this distinction or this, I guess, overlap between the merits and injury, said that the inquiry is to harm to the plaintiffs, not to the environment. Here the plaintiffs have submitted declarations saying the viability standard is being relaxed. That's going to harm our specific areas. And I think that's adequate proof under the Laidlaw decision. With respect to the argument that the EA prepared by the government wasn't necessary because the regulation would have no effect, I would just emphasize to the Court that the CEQ regulations specifically include rules and regulations in the definition of agency actions that are subject to EAs and EISs. With respect to the assertion that the Forest Service has categorically excluded national regulations from NEPA's requirements itself, that has occurred only within the Forest Service's own manual. What the CEQ requires agencies to do, if they're going to categorically exclude some action from NEPA, is to go through a public rulemaking process to identify what they intend to categorically exclude. And if the Forest Service is going to categorically exclude from NEPA or attempt to categorically exclude from NEPA its national regulations that have more impact than anything else it does on the national forests of this country, it should at least do that by regulation and give the public an opportunity to comment on that. Unless the Court has more questions, that's all I have. Thank you. Thank you very much. All right. The panel will take a brief recess before we get to the next and last case on the calendar. So we stand in recess at this time. All rise.
judges: Noonan, Tashima, Wardlaw